# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **MARK RISSER,** | : | **CIVIL ACTION NO. 1:17-CV-357** |
| | : | |
| **Plaintiff** | : | **(Chief Judge Conner)** |
| | : | |
| **v.** | : | |
| | : | |
| **STEELTON-HIGHSPIRE SCHOOL** | : | |
| **DISTRICT, DR. ELLEN** | : | |
| **CASTAGNETO, and LISA CRUM,** | : | |
| | : | |
| **Defendants** | : | |

## MEMORANDUM

Plaintiff Mark Risser ("Risser") commenced this action against his employer and two former supervisors asserting claims of discrimination and retaliation under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, and the Pennsylvania Human Relations Act ("PHRA"), 43 PA. STAT. AND CONS. STAT. ANN. §§ 951-963. Defendants Steelton-Highspire School District (the "School District"), Dr. Ellen Castagneto ("Castagneto"), and Lisa Crum ("Crum") move for summary judgment pursuant to Federal Rule of Civil Procedure 56. (Doc. 38).

## I.  Factual Background & Procedural History[1]

The School District hired Risser on August 12, 2013, as an elementary school teacher.  (Doc. 43-2 at 9).  The employment contract did not specify what grade Risser would teach.  (Doc. 40 ¶ 15).  Risser's Instructional I certification and approximately five years of teaching experience qualified him to teach at any elementary school grade level.  (See id. ¶¶ 5, 18).  Risser initially received a fourth-grade teaching assignment for the 2013-2014 school year, (Doc. 43-2 at 9), but prior to the commencement of classes, Risser was informed that the fourth-grade teaching position had been previously offered to someone else by the former

---

[1] Local Rule 56.1 requires that a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 be supported "by a separate, short, and concise statement of the material facts, in numbered paragraphs, as to which the moving party contends there is no genuine issue to be tried."  LOCAL RULE OF COURT 56.1. A party opposing a motion for summary judgment must file a separate statement of material facts, responding to the numbered paragraphs set forth in the moving party's statement and identifying genuine issues for trial.  See id.  Unless otherwise noted, the factual background herein derives from the parties' Rule 56.1 statements of material facts.  (See Docs. 40, 43).  To the extent the parties' statements are undisputed or supported by uncontroverted record evidence, the court cites directly to the statements of material facts.

In addition to providing responses to each paragraph in defendants' statement of material facts, Risser's statement of material facts includes a section styled as "Plaintiff's Additional Material Facts," consisting of an additional 51 numbered paragraphs.  (Doc. 43 at 20-28).  Neither Federal Rule of Civil Procedure 56 nor Local Rule 56.1 authorizes this portion of his filing, and Risser did not request leave of court therefor.  Nevertheless, the court has considered and scrutinized this supplemental information and defendants' response thereto, (Doc. 46), as well as the entire record to determine the uncontroverted facts of this matter.

principal, (Risser Dep. 31:11-19).[2]  The School District then offered Risser the choice

of teaching second or sixth grade, and he selected second grade.  (Doc. 40 ¶¶ 16-17).

## A.      2013-2014 School Year

During the fall of 2013, Risser began experiencing anxiety when teaching

in the classroom due to his disability.[3]  (Id. ¶ 20; see Crum Dep. 9:22-10:3; Montiel

Dep. 60:6-15).  Following his first anxiety episode, Risser informed then-Principal

Crum and then-Assistant Principal Montiel of his mental health disability.  (Crum

Dep. 9:22-10:9; Doc. 40 ¶¶ 4, 19; Doc. 43 ¶ 19).  Risser missed 26.5 days of teaching

between late September and early November of 2013.  (Doc. 40 ¶ 22; Doc. 43 ¶ 22;

see also Doc. 43-2 at 33).  Risser took these medical leaves of absence to adjust to

medications associated with his mental health treatment.  (Doc. 40 ¶ 23).

Risser's treating psychiatrist approved Risser's return to work and supported

his desired return date of November 11, 2013.  (Doc. 43-2 at 10).  The School District

required Risser to undergo a special medical examination prior to resuming his

teaching position.  (Doc. 40 ¶ 28).  According to then-Superintendent Castagneto,

the School District required this examination because of parental concerns about

the consistency of education that Risser's students were receiving and to ensure

---

[2] Partial deposition transcripts have been filed by the parties as attachments
to their statements of material facts.  (Docs. 40, 43, 46).  Unless otherwise noted, the
court will cite to this deposition *passim* as "Risser Dep." without a docket entry
citation.  The court employs this citation convention for deposition transcripts
throughout this memorandum.

[3] A detailed discussion of Risser's disability is not necessary to disposition of
the instant motion.  We will therefore refer to Risser's disability in general terms to
protect his privacy.

that Risser was "comfortable coming back" and "ready to come back." (See Castagneto Dep. 15:10-16:22; Doc. 40 ¶ 3; see also Carricato Dep. 52:3-8). Risser objected to the examination, but his union declined to file a grievance because the examination did not violate any terms of the collective bargaining agreement. (Carricato Dep. 52:21-53:16; Risser Dep. 38:8-21). Risser received full salary and medical benefits pending the outcome of the examination. (Doc. 40 ¶ 34: Doc. 43 ¶ 34).

Castagneto contracted with psychiatrist Brett DiGiovanna ("Dr. DiGiovanna") to conduct the special medical examination. (Doc. 43-2 at 103). After the parties negotiated the terms of a medical waiver, Dr. DiGiovanna examined Risser on April 15, 2014, and issued a report six days later. (Doc. 40 ¶¶ 32-33, 35; Doc. 43 ¶ 32; Risser Dep. 38:8-21). The report chronicled Risser's mental health history, noted the treatment he was receiving, and identified sources (medical and personal) of his anxiety in the classroom. (Doc. 43-2 at 33-35, 37). Dr. DiGiovanna concluded that Risser was "currently psychiatrically stable and has been for the past 4 months. He is currently fit to resume his duties as an elementary school teacher safely." (Id. at 37). Dr. DiGiovanna also counseled that, given Risser's history of "significant anxiety at work," Risser would "benefit from a gradual resumption of work hours, e.g., 25% time the first week, increasing by 25% weekly as tolerated." (Id. at 38). The report concluded by recommending that Risser refrain from engaging in any "extra duties," such as coaching or committee participation, to limit his stress. (Id.)

Risser returned to work "on a gradual basis" in early May 2014. (See Doc. 40 ¶ 39; Doc. 43 ¶ 39; Doc. 43-1 at 56-57). He was assigned tasks that included, *inter alia*, cafeteria and recess duty, small group reading instruction, support work for other teachers, and chaperone responsibilities. (See Doc. 40 ¶ 39; Doc. 43 ¶ 39; Doc. 43-1 at 19, 56-57). The School District did not return Risser to his second-grade teaching position because Castagneto "wanted to make sure that he had every accommodation possible" in accordance with Dr. DiGiovanna's recommendations and to avoid disrupting the long-term substitute teacher who had taken over Risser's class. (See Doc. 40 ¶¶ 39-40; Doc. 43 ¶¶ 39-40; Castagneto Dep. 14:13-22; Carricato Dep. 51:24-52:2). Mary Carricato ("Carricato"), president of the teacher's union, testified that Risser should have been permitted to return to teaching notwithstanding concerns about the long-term substitute as there were "at least several substitutes that were in and out" of Risser's classroom during his extended leave of absence pending the special medical examination. (Carricato Dep. 51:24-52:20). Montiel testified that obtaining substitutes was difficult in part due to behavioral issues with students, including those in Risser's class. (Montiel Dep. 72:12-73:14).

In May 2014, defendants assigned Risser a second-grade teaching position for the 2014-2015 school year.[4] (Doc. 40 ¶ 42). Pennsylvania law required the School District to observe Risser prior to conclusion of the 2013-2014 school year. (Id. ¶ 44 (citing 24 PA. STAT. AND CONS. STAT. ANN. § 11-1123)). In early June 2014, Crum

---

[4] Risser requested a fourth-grade position, but defendants provided no guarantee that this request would be granted. (Doc. 40 ¶ 43).

observed and evaluated Risser for the first and only time during the 2013-2014 school year. (Doc. 40 ¶¶ 45-46; Doc. 43 ¶¶ 45-46). For his observation, Risser taught a 45-minute reading lesson for a second-grade class. (See Risser Dep. 50:6-21; Crum Dep. 17:15-24, 19:1-11). Risser maintains that he received insufficient time to prepare the lesson (three days) and that he was unfamiliar with both the class of students and the curriculum for the observation. (Risser Dep. 51:2-24; Crum Dep. 17:15-18:7, 19:1-11). Crum testified that Risser had trouble controlling student behavior and that "[Risser's] language and presentation of the material in his lesson was inappropriate for the grade level." (Crum Dep. 19:12-24). Crum recalled Risser becoming "flustered" when multiple students lacked pencils to complete an assignment. (Id. at 19:25-22:5; see also Doc. 43-1 at 72).

Crum assigned Risser a "needs improvement" performance rating and an "unsatisfactory" final rating and indicated that the School District would develop an improvement plan to be implemented during the 2014-2015 school year. (Doc. 38-19 at 2; Doc. 43-1 at 19-20, 80). Risser met with Crum, Montiel, and Carricato to discuss the evaluation. (Doc. 40 ¶ 56; Montiel Dep. 112:3-5). Crum testified that Risser's attendance "was not reflected in his evaluation" and that, as a teacher, Risser "should be able to go in and teach a classroom of kids" regardless of how long he was absent from school. (Crum Dep. 29:10-24). The principal did not sign Risser's June 2014 evaluation rating form until December 18, 2014, and the superintendent signed the form more than nine months later, on February 6, 2015. (Doc. 43-1 at 20).

School District employees and parents lodged complaints about Risser throughout the 2013-2014 school year.  Parents expressed concern that their children lacked a consistent teacher due to Risser's frequent absences.  (Castagneto Dep. 15:25-16:4).  Risser allegedly pointed his finger at a student in the cafeteria "like a gun" and said "pow pow, you're dead, I'm gonna kill you."  (Galinac Dep. 11:10-24).  In May 2014, Risser again supposedly pointed his finger like a gun at a colleague and pretended to rob her and steal from the money drawer.  (Doc. 38-6 at 2).  That same day, Risser purportedly said "What's up with Chef Boyardee over there?" in reference to a student wearing a head covering.  (Id.; Crum Dep. 34:23-35:1).  On another occasion, Risser allegedly told a student in the cafeteria that he was reading *Fifty Shades of Grey*, a well-known graphic adult novel.  (Crum Dep. 34:8-16).

**B.    Summer 2014**

Risser completed coursework for his Instructional II certification during the summer of 2014.  (Risser Dep. 79:1-9).  To obtain his certification, Risser needed to submit evidence of his teaching experience to the Pennsylvania Department of Education ("the Department").  (Id. at 79:9-12; Doc. 43-2 at 72).  Throughout June and July 2014, Risser emailed various School District employees about submitting records to the Department.  (Doc. 43-2 at 72-75).  When Risser emailed Castagneto on July 28, 2014, and indicated that the Department was still awaiting his School District records, Castagneto represented that the requested records were submitted on July 9, 2014.  (Id. at 75).  Risser engaged an attorney who contacted the School District regarding the at-issue records.  (Risser Dep. 79:24-80:2, 82:23-83:3).  The

Department later notified Risser that the School District records were received on August 4, 2014. (Doc. 43-2 at 77).

On August 6, 2014, Risser received an email from Castagneto's office informing Risser that he must provide evidence of his Instructional II certification by August 28 or the School District "will have no choice but to hire a properly certified teacher to fill [your] teaching position for the 2014-2015 school year." (Id. at 71). The Department issued Risser an Instructional II certification with an effective date of August 1, 2014. (Doc. 43-2 at 78; <u>see</u> Risser Dep. 83:4-9).

### C.  2014-2015 School Year

Crum and Montiel developed Risser's improvement plan for the 2014-2015 school year with stated goals of addressing (1) lesson development and instructional delivery and (2) classroom management. (<u>See</u> Doc. 40 ¶ 58; Doc. 43 ¶ 58). Despite his displeasure with the improvement plan, Risser agreed to comply with it. (<u>See</u> Doc. 40 ¶ 59; Doc. 43 ¶ 59). Risser met weekly with then-principal Montiel to review his lesson plans. (Risser Dep. 85:22-86:7; Doc. 43-1 at 29; Montiel Dep. 111:21-23). At some point in the fall of 2014, Risser physically restrained a male student in the cafeteria by pulling the student "by the front of his shirt" after he refused to stop throwing food at other students. (Doc. 43-1 at 22). Risser claims that this "use of force" was meant to prevent a fight from breaking out. (<u>Id.</u>) On another occasion, Risser similarly restrained a student in a hallway by pulling on the student's shirt. (<u>Id.</u>)

In November 2014, Travis Waters ("Waters") observed Risser, completed a "Teacher Observation – Comprehensive Report," and rated Risser as "proficient."[5] (Doc. 43-2 at 107-23).  On December 19, 2014, Montiel informed Risser that she would conduct a mid-year performance evaluation under the improvement plan. (Doc. 40 ¶ 62).  That same day, a parent reported that Risser threw a chair during class on December 17, 2014.  (Id. ¶ 63).  Castagneto suspended Risser with pay on December 23, 2014, pending an investigation into the following issues:

1. Alleged failure to report a "live" surge protector in your classroom in a timely fashion.
2. Alleged improper physical contact with a student, in the hallway.
3. Alleged improper physical contact with a student, in the cafeteria.
4. Alleged failure to use the directed curriculum.
5. The alleged throwing of a chair in a classroom filled with second grade students.
6. Multiple complaints by parents.

(Doc. 38-12 at 2).  Local police officers escorted Risser out of the elementary school, supposedly at Carricato's direction.  (Montiel Dep. 111:6-20; but see Carricato Dep. 15:24-16:2).  As a result of the suspension and pending investigation, Risser resigned from his coaching position at a nearby high school.  (Doc. 40 ¶ 69; Doc. 43 ¶ 69).

In March 2015, Risser received the results of his mid-year evaluation assigning him a final rating of "unsatisfactory."  (Doc. 40 ¶ 70; Doc. 43 ¶ 70).  The evaluation form was signed by Montiel on January 19, 2015, and by Castagneto on

_____

[5] Risser claims Waters was assistant principal at this time, (Doc. 42 at 21), but the record is unclear, (see Doc. 46-4; Doc. 38-19 at 2).  This report appears distinct from Montiel's performance evaluation, discussed infra, which was conducted in December 2014, and the parties provide no clarification as to why this evaluation did not factor into the School District's decisionmaking as to Risser's employment.

February 11, 2015.  (Doc. 43-1 at 81).  The evaluation purportedly covered a teaching period of August 25, 2014, to January 19, 2015, even though Risser was suspended and unable to teach from December 23, 2014, to January 19, 2015.  (Id. at 19).  Based on two consecutive "unsatisfactory" ratings, Castagneto suspended Risser without pay on March 2, 2015, pending the school board's approval of termination.  (Doc. 40 ¶¶ 71-72).  On October 22, 2015 the school board voted to terminate Risser.  (Doc. 43-1 at 4).

Risser filed a grievance challenging the "unsatisfactory" evaluations, his suspension without pay, and his ultimate termination.  (Doc. 40 ¶ 74).  The parties proceeded to arbitration and Risser prevailed.  (Id.)  In a decision dated August 12, 2016, the arbitrator determined that the School District "failed to show just cause" for Risser's suspension and termination.  (Doc. 43-1 at 35).  The arbitrator found none of the School District's proffered rationales to be valid.  (Id. at 18-34).  As to competency, the arbitrator noted several deficiencies, including that neither of the "unsatisfactory" ratings was properly approved by School District administrators, (id. at 19-20); that the 2013-2014 rating of "needs improvement" is considered a "satisfactory rating" for a first evaluation under Pennsylvania regulations, (id. at 19 (citing 24 PA. STAT. AND CONS. STAT. ANN. § 11-1123(f)(3))); and that the 2014-2015 evaluation purported to cover a period during which Risser was suspended and unable to teach.  (Id.)  The arbitrator concluded that termination was unjustified on grounds of incompetency.  (Id. at 20).

As to the allegations of inappropriate physical contact with students, the arbitrator found the School District's claims to be either unfounded or overstated.

(Id. at 21-28).  The arbitrator opined that, to the extent any inappropriate physical contact occurred, it did not rise to the level of "physical abuse sufficient to establish either cruelty or intemperance" under the law.  (Id. at 27-28).  The arbitrator also determined that Risser had not been persistently negligent in performing classroom duties, and that the School District provided insufficient evidence that Risser's classroom management and teaching were deficient or that he received adequate notice that defendants were unsatisfied with his performance.  (Id. at 28-32).  In response to an argument that the School District took steps to terminate Risser after he filed a discrimination complaint, the arbitrator clarified that "[n]o findings or conclusions are reached with respect to this allegation of retaliation."  (Id. at 31).  The School District reinstated Risser to his teaching position with full back pay and benefits.  (Doc. 40 ¶ 75).

### D.    Procedural History

Risser filed administrative complaints alleging disability discrimination on November 25, 2014, March 26, 2015, and March 24, 2016.  (Doc. 43 ¶ 96; Doc. 46 ¶ 96).  The first administrative complaint was served on defendants by first class mail on January 15, 2015.  (Doc. 38-20 at 2).  The United States Equal Employment Opportunity Commission issued Risser right-to-sue letters for each of his three administrative complaints on December 2, 2016, February 15, 2017, and February 22, 2017, respectively.  (Doc. 13, Ex. A at 1-3).  Risser commenced this action on February 27, 2017, and filed an amended complaint on March 28, 2017.  After Rule 12 motion practice, the following claims remain: (1) disability discrimination and retaliation in violation of the ADA against the School District, and (2) disability

discrimination and retaliation in violation of the PHRA against all defendants.

Defendants now move for summary judgment under Federal Rule of Civil

Procedure 56. The motion is fully briefed and ripe for disposition.

## II. <u>Legal Standard</u>

Through summary adjudication, the court may dispose of those claims that

do not present a "genuine dispute as to any material fact" and for which a jury trial

would be an empty and unnecessary formality. FED. R. CIV. P. 56(a). The burden of

proof tasks the non-moving party to come forth with "affirmative evidence, beyond

the allegations of the pleadings," in support of its right to relief. <u>Pappas v. City of

Lebanon</u>, 331 F. Supp. 2d 311, 315 (M.D. Pa. 2004); <u>see also</u> <u>Celotex Corp. v. Catrett</u>,

477 U.S. 317, 322-23 (1986). The court is to view the evidence "in the light most

favorable to the non-moving party and draw all reasonable inferences in that party's

favor." <u>Thomas v. Cumberland County</u>, 749 F.3d 217, 222 (3d Cir. 2014). This

evidence must be adequate, as a matter of law, to sustain a judgment in favor of the

non-moving party on the claims. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 250-

57 (1986); <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587-89

(1986). Only if this threshold is met may the cause of action proceed. <u>See</u> <u>Pappas</u>,

331 F. Supp. 2d at 315.

## III. <u>Discussion</u>

The ADA bars an employer from "discriminat[ing] against a qualified

individual on the basis of disability." 42 U.S.C. § 12112(a). Employers are also

prohibited from retaliating against an individual for engaging in protected activity

under the statute, which includes making a charge of discrimination, testifying, or

"participat[ing] in any manner in an investigation, proceeding, or hearing." 42

U.S.C. § 12203(a). Courts analyze disability discrimination claims under the PHRA

and the ADA coextensively. Capps v. Mondelez Glob., LLC, 847 F.3d 144, 150 n.1

(3d Cir. 2017). Accordingly, the following ADA analysis applies equally to Risser's

PHRA claims unless otherwise noted.

## A. Disability Discrimination

The court analyzes ADA discrimination claims based on circumstantial

evidence under the burden-shifting framework articulated in McDonnell Douglas

Corp. v. Green, 411 U.S. 792, 802-05 (1973). See Williams v. Phila. Hous. Auth.

Police Dep't, 380 F.3d 751, 759-60 & n.3 (3d Cir. 2004) (citing Shaner v. Synthes, 204

F.3d 494, 500 (3d Cir. 2000)). The analysis proceeds in three steps. First, the

plaintiff "must establish a *prima facie* case of discrimination" under the applicable

statute. Shaner, 204 F.3d at 500 (emphasis added) (quoting Jones v. Sch. Dist. of

Phila., 198 F.3d 403, 410 (3d Cir. 1999)). The burden then shifts to the defendant to

articulate one or more legitimate, nondiscriminatory reasons for its employment

decision. See McDonnell Douglas, 411 U.S. at 802; Shaner, 204 F.3d at 500 (quoting

Jones, 198 F.3d at 410). If the defendant meets its burden, the plaintiff must prove

by a preponderance of the evidence that the defendant's articulated reasons for its

employment decision were merely pretext for discrimination. See McDonnell

Douglas, 411 U.S. at 804-05; Shaner, 204 F.3d at 500 (quoting Jones, 198 F.3d at 410).

The parties agree that the McDonnell Douglas framework governs the court's

analysis of Risser's claims. (See Doc. 39 at 5-6; Doc. 42 at 4).

## 1. Prima Facie *Case*

To establish a *prima facie* case of disability discrimination, Risser must demonstrate that (1) he is disabled within the meaning of the ADA; (2) he is otherwise qualified for the position, with or without reasonable accommodations; and (3) he suffered an adverse employment action as a result of discrimination. Sulima v. Tobyhanna Army Depot, 602 F.3d 177, 185 (3d Cir. 2010) (citing Taylor v. Phoenixville Sch. Dist., 184 F.3d 296, 306 (3d Cir. 1999)). Defendants assume for purposes of their Rule 56 argument that Risser is properly classified as disabled under the ADA and PHRA. (See Doc. 39 at 18-19).

A "qualified individual" under the ADA "can perform the essential functions of the employment position that such individual holds or desires" with or without reasonable accommodation. 42 U.S.C. § 12111(8). In assessing whether someone is a qualified individual with a disability, a court must consider whether the individual has the appropriate prerequisites including educational background, employment experience, skills, or licenses; and whether the individual was able to perform the essential functions of the held or desired position, without or without reasonable accommodation, at the time of the employment decision. Gaul v. Lucent Techs., Inc., 134 F.3d 576, 580 (3d Cir. 1998) (quoting 29 C.F.R. § 1630.2(m), App. at 353-54). An employer's judgment as to the essential functions of the at-issue position is a pertinent consideration. 42 U.S.C. § 12111(8).

During the relevant times, Risser maintained his Instructional I certification and he earned an Instructional II certification before commencement of the 2014-2015 school year. (Doc. 40 ¶ 18; Doc. 43-2 at 78). At the time of his termination,

Risser had been teaching elementary school for approximately six years.  (See Doc. 40 ¶¶ 5, 14, 26, 28, 34, 42, 62, 71).  Defendants acknowledge that Risser was "unquestionably qualified to teach in a [second] grade classroom" when he was hired in 2013, (Doc. 39 at 7-8), but asseverate that Risser's inappropriate conduct toward students combined with his two consecutive "unsatisfactory" evaluations rendered him unqualified to continue teaching in the School District, (id. at 13-14, 17-18).

The record reflects competing narratives regarding the circumstances surrounding the alleged incidents and Risser's performance evaluations.  Moreover, Risser was reinstated to his teaching position with back pay and benefits after the arbitrator concluded that the School District's proffered reasons for suspending and terminating Risser were insufficient under or inconsistent with Pennsylvania law and the collective bargaining agreement.  (Doc. 43-1 at 18-31, 35).  Ample facts exist for a reasonable jury to conclude that Risser was and remained qualified for his teaching position during the 2013-2014 and 2014-2015 school years.

The parties also dispute the third element of Risser's *prima facie* case, to wit: whether Risser suffered an adverse employment action due to discrimination.  The ADA prohibits disability discrimination against a qualified individual in all aspects of employment including "job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a).  Defendants concede only that Risser suffered adverse employment action.  They argue that

Risser was not subjected to this adverse employment action because of disability.[6] (Doc. 39 at 19-20).

Risser identifies multiple adverse employment actions taken against him. (Doc. 42 at 6-7). During the 2013-2014 school year and following a period of medical leave, Risser was prohibited from returning to the classroom. (Doc. 40 ¶ 28). Risser's treating psychiatrist cleared him to resume teaching in November 2013, yet defendants did not allow Risser to return to the classroom until Dr. DiGiovanna conducted a separate evaluation in April 2014. (See Doc. 43-2 at 10; Doc. 40 ¶¶ 28, 33, 39). Even after Dr. DiGiovanna opined that Risser could return to teaching, defendants declined to provide him any classroom teaching opportunities for the remainder of the school year. (Doc. 40 ¶¶ 39-40; Doc. 43 ¶¶ 39-40; Doc. 43-1 at 19). Instead, Risser was assigned tasks he considered "menial" such as cafeteria and recess duty and other chaperone responsibilities. (Doc. 40 ¶ 39; Doc. 43 ¶ 39; Doc. 42 at 13). Notably, Risser's psychiatrist placed no such restrictions on his return to work. (See Doc. 43-2 at 10).

Risser also suffered adverse employment action throughout the 2014-2015 school year. He was suspended with pay in December 2014 pending his mid-year

---

[6] The causation inquiry under the *prima facie* case "is not easily distinguishable" from the subsequent analysis of pretext. Farrell v. Planters Lifesavers Co., 206 F.3d 271, 286 (3d Cir. 2000). Moreover, caselaw suggests that a plaintiff need not establish causation as part of his or her *prima facie* case. See, e.g., Armstrong v. Burdette Tomlin Mem'l Hosp., 438 F.3d 240, 251 (3d Cir. 2006). In the interest of completeness, and because the McDonnell Douglas framework does not require that courts "ration the evidence between one stage or the other," Farrell, 206 F.3d at 286, this court will not limit its consideration of the parties' causation arguments to the pretext stage.

evaluation results and an investigation into alleged misconduct. (Doc. 38-12 at 2). He was then suspended in March 2015 without pay and ultimately terminated. (Doc. 40 ¶¶ 71-72, 74). In taking these actions, defendants relied heavily on two performance evaluations, the validity of which is in question. (Doc. 43-1 at 19-20). As the arbitrator noted, the competency and misconduct justifications offered by the School District suffer both procedural and substantive flaws. (See id. at 17-20, 81); see supra at 10-11. A reasonable jury could find on this record that Risser suffered material changes in his employment conditions during the 2013-2014 and 2014-2015 school years because of his disability. Risser has established a *prima facie* case of disability discrimination under the ADA and PHRA.

## 2. *Legitimate, Nondiscriminatory Reason*

The burden now shifts to defendants to articulate one or more legitimate, nondiscriminatory reasons for their employment decisions. See McDonnell Douglas, 411 U.S. at 802; Shaner, 204 F.3d at 500 (quoting Jones, 198 F.3d at 410). This burden is one of production, not persuasion, and requires an employer to submit evidence which, presumed true, permits the conclusion that there was a legitimate and nondiscriminatory reason for its adverse employment action. Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994). We have little difficulty concluding that defendants have met their burden.

Defendants note that they permitted Risser to take paid medical leave during the 2013-2014 school year. (Doc. 40 ¶ 25; Doc. 43 ¶ 25). Castagneto represents that Risser was required to undergo a special medical examination to ensure he was "comfortable" and "ready" to return to the classroom and to address parental

concerns.  (See Castagneto Dep. 15:10-16:22; Carricato Dep. 52:3-8).  Defendants claim that the nearly six-month delay in arranging the medical examination was the unfortunate result of good faith efforts to negotiate terms with the teacher's union, locate a suitable provider, and negotiate Risser's medical waiver.  (Doc. 39 at 12). After Dr. DiGiovanna concluded that Risser was fit to return to work, defendants declined to immediately return him to a classroom.  (Doc. 40 ¶ 39; Doc. 43 ¶ 39; Doc. 43-1 at 19, 56-57).  Defendants attribute their "gradual" approach to increasing Risser's responsibilities to concern for his mental health and for continuity of education from the long-term substitute teacher.  (Doc. ¶¶ 39-40; Doc. 43 ¶¶ 39-40; Castagneto Dep. 14:13-22).

Defendants identify alleged misconduct as support for their decisionmaking the following year.  Risser was suspended in December 2014 after he supposedly threw a chair in a classroom and engaged in improper physical contact with two students.  (Doc. 40 ¶ 63; Doc. 43-1 at 22).  Defendants investigated these allegations through the beginning of 2015, at which point Risser received his second successive "unsatisfactory" evaluation.  (Doc. 38-12 at 2; Doc. 40 ¶ 70; Doc. 43 ¶ 70).  They maintain that the decision to ultimately terminate Risser rested primarily on his consecutive "unsatisfactory" ratings as well as his inability to behave appropriately toward students and manage his classroom effectively.  (Doc. 39 at 13-14, 17-18; see also Crum Dep. 19:12-22:5; Doc. 43-1 at 72).  Defendants have satisfied their burden of articulating a legitimate, nondiscriminatory reason for the adverse employment actions taken against Risser.

### 3. *Pretext*

At the third step of the <u>McDonnell Douglas</u> paradigm, the plaintiff may defeat summary judgment by identifying evidence "from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." <u>Shaner</u>, 204 F.3d at 501 (quoting <u>Fuentes</u>, 32 F.3d at 764). A plaintiff must do more than simply claim a decision was wrong or mistaken to discredit a proffered justification. <u>Id.</u> (quoting <u>Fuentes</u>, 32 F.3d at 765). The plaintiff "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence, and hence infer that the employer did not act for the asserted non-discriminatory reasons." <u>Id.</u> (quoting <u>Fuentes</u>, 32 F.3d at 765).

Risser has adduced sufficient evidence impugning defendants' proffered reasons for terminating him. As already noted, the arbitrator that presided over Risser's grievance hearing rejected each of defendants' justifications for suspending and terminating Risser on procedural and substantive grounds, finding, *inter alia*, that Risser's performance evaluations were procedurally and substantively deficient, that he was not negligent in performance of his teaching responsibilities, and that he did not physically abuse students. (Doc. 43-1 at 19-32). Risser received a "proficient" rating from Waters in November 2014, (Doc. 43-2 at 107-23), yet nothing in the record indicates defendants considered this rating in deciding

whether to suspend or terminate Risser. (See Docs. 39, 45; Doc. 46 ¶ 131).

Defendants correctly note that whether the disciplinary consequences were discriminatory or retaliatory in nature was not a question before the arbitrator. (Doc. 45 at 3-4). However, the arbitrator's decision is directly relevant to the credibility of defendants' asserted non-discriminatory reasons for the disciplinary action.

Risser points to additional evidence of pretext. He claims that defendants forced him to undergo a special medical examination before returning to work despite his treating psychiatrist's recommendation that he be permitted to return, without conditions, in November 2013. (Compare Doc. 43-2 at 10 with Doc. 40 ¶ 28). Six months elapsed before that examination took place. (Doc. 40 ¶¶ 28, 33, 39). Risser contends that defendants used Dr. DiGiovanna's recommendation that he be permitted to return to work in a gradual fashion as an excuse to deny him the opportunity to teach through the end of the school year, (Doc. 40 ¶¶ 39-40; Doc. 43 ¶¶ 39-40; Doc. 43-1 at 19), and instead relegated him to "menial" tasks. (Doc. 40 ¶ 39; Doc. 43 ¶ 39; Doc. 42 at 13). The record also casts doubt on defendants' second reason for not restoring Risser to his normal teaching position, *viz.*, to maintain the continuity of the long-term substitute teacher. (Doc. 40 ¶ 40; Doc. 43 ¶ 40; Carricato Dep. 51:24-52:2). Carricato suggested that there were several substitutes in Risser's class during his absence. (Carricato Dep. 51:24-52:20). Risser also suggests, and the record supports an inference, that defendants delayed in providing his employment records to the Department to support his Instructional II certificate, and then threatened to replace him for failing to obtain that very certificate. (See Doc. 43-2

at 71-75, 77).  Risser has identified genuine disputes of material fact as to the pretext element of his discrimination claim.

## B. Retaliation

The McDonnell Douglas framework also applies to Risser's claim of retaliation.  Shaner, 204 F.3d at 500.  To establish a *prima facie* case of retaliation, Risser must demonstrate that (1) he engaged in a protected activity, (2) the employer subjected him to an adverse employment action, and (3) "a causal connection" between the protected activity and adverse action.  Id. (quoting Krouse v. Am. Sterilizer Co., 126 F.3d 494, 500 (3d Cir. 1997)).  Risser avers that defendants retaliated against him for filing his first administrative complaint of discrimination.  (Doc. 13 ¶¶ 79-81).  Defendants concede that this filing constitutes protected activity but argue that Risser cannot establish a causal connection between his filing of the administrative complaint and his suspension and termination.  (Doc. 39 at 22).  We are constrained to agree.

The causal link analysis frequently turns on two factors: "(1) the temporal proximity between the protected activity and the alleged discrimination and (2) the existence of a pattern of antagonism in the intervening period."  Jensen v. Potter, 435 F.3d 444, 450 (3d Cir. 2006) (citations and internal quotation marks omitted) overruled in part on other grounds by Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53 (2006).  The temporal proximity alone may raise the requisite inference when the timing is "unusually suggestive of retaliatory motive."  Id. at 450 (quoting Krouse, 126 F.3d at 503-04); Williams, 380 F.3d at 760 (quoting Shellenberger v. Summit Bancorp, Inc., 318 F.3d 183, 189 & n.9 (3d Cir. 2003)).  A lapse of two days

between protected activity and a retaliatory action has been deemed "unusually suggestive." See Jalil v. Avdel Corp., 873 F.2d 701, 708 (3d Cir. 1989). When close temporal proximity is absent, courts "may look to the intervening period for other evidence of retaliatory animus." Jensen, 435 F.3d at 450 (citation omitted); see also Williams, 380 F.3d at 760. For example, in Shellenberger, a supervisor's threatening comments made ten days prior to termination, combined with additional evidence of retaliation, were sufficient to establish a causal link. Shellenberger, 318 F.3d at 189.

Risser filed his first administrative complaint of discrimination on November 25, 2014. (Doc. 43 ¶ 96; Doc. 46 ¶ 96). Castagneto suspended Risser with pay on December 23, 2014, following his mid-year evaluation, allegations that he threw a chair in class, and several incidents involving alleged improper physical contact with students. (Doc. 40 ¶¶ 62-63; Doc. 38-12 at 2). As a threshold matter, Risser's suspension is too far removed from the filing of his first administrative complaint to suggest retaliatory motive on its own. Cf. Thomas v. Town of Hammonton, 351 F.3d 108, 114 (3d Cir. 2003). Moreover, Risser points to no evidence of antagonism or retaliation in the intervening four weeks to establish a causal connection. Nor could he: defendants did not receive notice of Risser's complaint until it was served on January 15, 2015, (Doc. 38-20 at 2), nearly one month *after* his initial suspension, (see Doc. 38-12 at 2), and there is no indication that defendants were aware of the complaint prior to service. The record is devoid of evidence that defendants suspended Risser *because* he filed an administrative complaint.

In his amended complaint, Risser suggests that defendants' decision to further suspend him without pay in March 2015 and ultimately terminate him also constitute retaliatory acts. (See Doc. 13 ¶¶ 82, 84). An employer is not required to suspend a previously planned action upon learning of protected activity. See Gairloch v. Pa. State Univ., 84 F. Supp. 3d 407, 419-20 (M.D. Pa. 2015) (quoting Clark Cty. Sch. Dist. v. Breeden, 532 U.S. 268, 272 (2001)); Merit v. SEPTA, 315 F. Supp. 2d 689, 708 n.69 (E.D. Pa. 2004), aff'd 122 F. App'x 598 (3d Cir. 2005) (same). An employer's decision to proceed "along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality." Breeden, 532 U.S. at 272.

Castagneto initially suspended Risser with pay in December 2014 pending an investigation into his conduct and performance. (Doc. 38-12 at 2). The investigation proceeded after defendants learned of Risser's first administrative complaint, and defendants ultimately elected to suspend him without pay and recommend his termination to the school board for the same reasons Risser was initially suspended. (Doc. 40 ¶¶ 71-72). Risser cannot rely on defendants' consistent conduct, which began prior to their knowledge of the first administrative complaint, to establish a causal link between his protected activity and the alleged retaliatory action. Therefore, we will grant summary judgment in favor of defendants as to Risser's ADA and PHRA retaliation claims.

## IV.  Conclusion

The court will grant in part and deny in part defendants' motion (Doc. 38) for

summary judgment.  An appropriate order shall issue.


/S/ CHRISTOPHER C. CONNER
Christopher C. Conner, Chief Judge
United States District Court
Middle District of Pennsylvania


Dated:    March 25, 2019